Good morning, and may it please the Court, my name is Scott Collins, and I'm here today for Appellant James Coghlan. I would like to reserve five minutes for rebuttal time. The district court prepared in granting summary judgment dismissing Coghlan's national origin discrimination claims against his former employer, American Seafoods, in three ways. First, the district court disregarded specific and substantial evidence supporting his claims. Second, it viewed the evidence in a light most favorable to ASC, the moving party, and against Coghlan, the non-moving party. And third, the district court misapplied the same actor inference as a mandatory presumption rather than as an inference. As a result, Coghlan is entitled to reversal of the dismissal of his claims and remand of his case to the district court for trial by jury. Coghlan brought this action claiming that ASC discriminated against him in his employment based on his national origin. In less than four months, ASC made four decisions adverse to him in which the company promoted individuals of Norwegian national origin over him. The first decision was in September 2001 in which ASC appointed Norwegian-born Jarl Hagseth, not Coghlan, as the relief master of the factory trawler American dynasty. Okay, you've given us a very short range or snapshot of events. Is that truly representative? Don't we have to look at a wider range and see that in context, he was given favorable treatment as well as unfavorable treatment? I do, because circumstances change from the time he was given favorable treatment, and I would submit that it was not as favorable as ASC would have you believe. But the circumstances changed because in the fall of 2001, the critical circumstance that happened is two Norwegian-born masters became available to American Seafoods. The first was Jarl Hagseth, who previously had not worked for American Seafoods. He was working for another company. Now, who was the Norwegian that was an American citizen, naturalized citizen? Was it Hagseth? Well, all of the Norwegians we will talk about are naturalized U.S. citizens, because to be a master on a factory trawler, you must have a license. To have a license, you must be a naturalized U.S. citizen. But we're talking about there's Inge Andreasen, who was American Seafoods' vice president of operations. He is Norwegian-born. So there's no distinction between citizen and non-citizen here. We're just looking at it on a national origin basis. All relevant people are U.S. citizens. That's right. But they have to be foreign-born. Foreign-born U.S. citizens is the class that you claim that your client is in that was discriminated against. No. My client is American-born, claiming that he was discriminated against by the company. In favor of foreign-born. That's right. Norwegian-born specifically. Yeah. Okay. Mr. Collins, with respect of the point you're trying to make that the same actor inference should not be allowed in this case because circumstances are different, you say that before 2001 there were no Norwegian-born or Norwegian-ethnic captains available for American Seafoods? No. Is there any evidence of that? Well, let me explain. That is not entirely true. But what I'm suggesting here is we have two captains who came to American Seafoods, to Inge Andreasen in particular, in the fall of 2001. But you're not saying that there weren't Norwegian sea captains and Norwegian-ethnic sea captains out there in the great wide world, are you? I'm not saying that, but they did not become available to American Seafoods. Let's go back. What do you mean they didn't apply for employment? Is there evidence that prior to 2001 these two captains hadn't applied for employment? Let me take each one individually. Let's talk about Ole Nott. He's the individual who became the master on the American dynasty for the 2002 fishing season. The evidence is he did not receive his master's license until early 2002. Until he received his master's license, he could not become the master of a factory trawler under a U.S. flag operating in U.S. waters. That's a change in circumstance. The second individual is Jarl Hogsad. He relates to the two claims concerning the appointments of a relief master on the American dynasty and then the claim concerning the appointment of a master on the Cadian at the beginning of 2002. We don't know when he received his master's license. We do know that at least in 1996, when he was working aboard the Resolute, which is a non-ASC vessel, and this is in the record, he was a fishmaster operating under Master Larry Perino. And that's important because one of the facts that we're submitting, or the evidence, is Larry Perino was also removed from his position to replace him with a Norwegian base. But my question is a little bit broader than that. Yes. Don't we have to take into account when we're talking about the same actor inference, and you're correct in saying that there should not be an inclusive presumption, that the employer here employed Kauffman when there were available Norwegian sea captains, Norwegian-born sea captains. They may have been available in the world. All the way from here to Norway. But Ole Knotten was not available as a master. These particular individuals who were later appointed were not available. That's right. But in order to evaluate the same actor favorable treatment, we have to determine whether at that time there were some other Norwegians available. There may not be any evidence of that. And there is no evidence to their availability. While we're on the same actor inference, The argument is made that Inge Andreasen made a favorable decision for James Coughlin in 2000 by transferring him over to the American dynasty. And the argument and what the district court said is that raises the same actor inference because if he had treated him favorably in that instance, he would not have treated him unfavorably in another instance. Now, who determines whether it's favorable or not? Is it just the individual, Mr. Coughlin? If he says it's not favorable, notwithstanding the fact that in context it may appear to another observer to be favorable, what controls? Interestingly here, Coughlin considered that transfer to be favorable because it allowed him to get more wages. But to answer your question, it's the individual who makes the decision on the transfer in this case as to whether it's favorable or not. That decision was made by Inge Andreasen, who testified that he did not consider that transfer to be favorable. The reason he made the transfer was because it was, frankly, out of convenience to the company. The company is bringing the American dynasty back into operation. The Cadian on which Mr. Coughlin is working has a very shortened fishing season. It's back in town. The vessel is idle. Coughlin is idle. Inge Andreasen needs two wheelhouse officers. He has Coughlin sitting there. He brings Coughlin in. He testified that was really a matter of convenience. And Andreasen went one step further. He actually considered the move from Coughlin to the dynasty to be a demotion, to be a step down, because on the Cadian he was a captain, a master. On the dynasty, he was put into the mate position. So he considered the fact that he stepped down in his office was a demotion. But his pay was at least equal or more, wasn't it? I believe his pay would be more simply because the dynasty was operating more months. The Cadian is a cod fishing vessel. But when you say it's unfavorable, it's only a matter of status. When you stand point of earning a living, it's better, right? Coughlin would agree with you on that. That's why he viewed the transfer as favorable. But I think you have to look inside the mind of the decision-maker and whether he considered it favorable. And the decision-maker here did not consider that to be a promotion. He considered it merely to be a transfer from one vessel to another. Unless the Court has specific questions pertaining to the application of the McDonnell-Douglas framework for shifting the production of evidence in this disparate treatment case, I would like to focus on what I think is the crux of this case. After Coughlin established his prima facie case, and after ASC proffered its explanation for making the four decisions at issue, the remaining question boils down to this. Did Coughlin present specific and substantial evidence showing that Andreasen was motivated by national origin in making the four decisions at issue? One perhaps McDonnell-related question. I'm curious about the protected class here or the suspect class. It's certainly clear as to who the potential bad guys are, so to speak, in other words, ethnic Norwegians. But is that enough to establish in Mr. Coughlin a class standing? In other words, is it sufficient simply to be a non-ethnic Norwegian to be able to have standing to bring this kind of case? In this national origin case, it's sufficient that he is American-born and is in a protected class of American-born workers when they are discriminated against by Norwegian-born workers or decision-makers. You have to admit, this is an unusual setting. Typically, it's a female or a minority black or some other more highly recognized category. This is a very unusual setting. I recognize I'm representing a white Irish-American in a discrimination case, so I would agree with you. But nevertheless, he's entitled to as much protection under our anti-discrimination laws as is the case. As long as he can make out a proper class of non-ethnic Norwegian native-born. That's right. I want to be careful. This isn't ethnic Norwegians. This is Norwegian-born individuals. Norwegian-born as opposed to American-born. Okay. I got it. You're going to give us specific facts on each of the four occasions, which in the third step of McDonnell-Douglas raises a triable issue of fact and shows that the district court was in error? I don't have enough time to go into all of those specific facts, but I will. Well, give us your strongest. Give us your strongest. Yeah. Now, as we look at this, we're really in the third stage of the McDonnell-Douglas test, the pretext. Coghlan had two routes to go to prove pretext. He could either offer evidence from which a direct inference could be made that ASC was motivated by national origin, or he could offer evidence indirectly inferring discriminatory motive by showing that ASC's proffered explanations for the four decisions are unworthy of credence because they are internally consistent or otherwise unbelievable. The logic behind the second option is simply that if a fact finder rejects the employer's proffered explanation as unbelievable, it may infer the ultimate fact of discrimination without additional proof of discrimination beyond that presented in the plaintiff's prima facie case. And I want to emphasize that to establish pretext under either route, the plaintiff need produce very little evidence of discriminatory motive to raise a genuine issue of fact on this motion for summary judgment. Coghlan took both routes in offering evidence to prove pretext. He offered evidence from which ASC's discriminatory motives may be directly inferred, and he offered evidence from which a jury may indirectly infer such motives by finding ASC's proffered explanations to be unworthy of credence. Let me focus on the first route. The evidence from which ASC's motives may be directly inferred include the following. One, in each of the four decisions adversely affecting Coghlan over a four-month period, ASC chose a Norwegian-born individual over him. Second, with respect to one of those individuals, Jarl Hogseth, Andreasen preferred him over Coghlan without knowing anything about him or his qualifications, except that he was Norwegian of national origin. Third, even if Andreasen did consider Hogseth's qualifications, Coghlan's qualifications were clearly superior. Fourth, Andreasen violated ASC's promote from within policy in bringing Hogseth in and bringing in Naughton from outside the company. With respect to Naughton, it was clear to all, including Andreasen, that Coghlan's qualifications were superior. Naughton had never before served as a master or a mate on a U.S.-flagged vessel or on any other vessel operating within U.S. waters. His last service as a master occurred in the 1980s when he commanded smaller shrimp boats off the coast of Norway. Indeed, Naughton did not even hold a master's or a mate's license at the time he was promoted over Coghlan. The fifth type of evidence is that the Dynasty and the KDN were not the only vessels whose wheelhouses were restructured by Andreasen prior to the 2002 season. I already talked about American-born Larry Ferino, who at this time was master aboard another ASC vessel, the Ocean Rover. Okay, well, now apply Bradley and the same actor overlay to this situation. As you've described it before, Bradley is critically distinguishable from this case in an important way. In Bradley, the plaintiff had no evidence of pretext in that case. Here, Coghlan has specific and substantial evidence of pretext in this case.  That goes to the indirect issues. It goes to the third prong of the McDonnell-Douglas test. And the evidence that we have, you can directly infer from the circumstantial evidence discriminatory handling. You've already covered that. Now you're going to tell us about the indirect evidence. Sure. And the indirect evidence is if you look at the reasons articulated by American Seafoods, Coghlan presented evidence that both shows the premises for those articulated reasons to be false and that Andreasen knew or had very good reason to know that those premises were false. I would like to save time before we go. Absolutely. Unless there are any more questions, I will. We'll hear from Mr. Higgins. Thank you, Your Honors. May it please the Court, my name is Alexander Higgins on behalf of American Seafoods. I'm going to give you a very brief overview, discuss the appropriate legal standard, then go over the facts supporting summary judgment in this case, the undisputed facts, and then discuss some of the plaintiff's allegations raised in his brief and his argument. Summary judgment should be affirmed because plaintiff was demoted for legitimate business reasons  Plaintiff cannot show specific and substantial evidence that these reasons were pretextual. Plaintiff argues in his brief that all you need is very little evidence of pretext and here at oral arguments says all you have to show is that the reasons were unworthy of credence. That is not correct in the Ninth Circuit. It has always been consistent that where the plaintiff does not have direct evidence of discrimination, such as a bigoted statement, let's get rid of the Americans or something like that, you need to prove through specific and substantial evidence that the reasons given by the defendant were pretext for discrimination, in this case national origin discrimination. A case that came out after we briefed, which is important to cite too, which I'd like to add to our authorities, is Stiegel, S-T-E-G-I-E-L. Have you sent us a 28-J letter on that case? I have not. It's a 2,000- Now, Lee, would you please get from the Deputy Clerk the gum sheets that you will serve on your opponent as well as all three judges of the panel, please. I'd be happy to do that. Thank you, Your Honor. It's Stiegel v. Citadel Broadcasting, a Ninth Circuit 2004 case that says when direct evidence is unavailable and the plaintiff proffers only circumstantial evidence, then we require specific and substantial evidence of pretext to survive summary judgment. Also, I think an important part of the legal standard here to keep in mind is when you're looking at the defendant's business reasons for making this decision, it's not whether those business decisions were good or even whether they were right. It's whether they were honestly believed. As the Villarimo case cited in our brief on page 21 states, in judging whether the employer's preferred justifications were false, quote-unquote, it is not important whether they were objectively false, right or wrong. Courts only require that an employer honestly believed its reasons for its actions, even if its reasons were foolish, trivial or even baseless. Obviously, we're not saying that those reasons were in this case, but that sets the legal standard through which you look at the decisions made in this case. Also, another appropriate legal standard to bear in mind as an alternative theory to affirm the summary judgment is that no rational trier of fact in light of the undisputed evidence could find that national origin discrimination motivated the actors here. That's important because it goes to one of Your Honor's questions earlier about, isn't this an unusual case where an American, a white American comes in and says, I'm being discriminated against by American seafoods because I'm American? It doesn't sound right. And it doesn't sound right when you look at the evidence either. And may I use an illustrative exhibit on that as well? Judge Rothstein. Counsel, you're going to have to speak from the – you can certainly point to the exhibit, but you have to speak from the microphone so we can get it on tape. Oh, thank you, Your Honor. Can you all see that all right? I don't think your opponent can see it. Your own man can see it. Oh, certainly. Certainly. Thank you, Your Honor. Judge Rothstein did specifically also find that the no rational trier of fact could find discrimination in light of the undisputed evidence. Here the undisputed evidence is that the president of the company, Mike Hyde, who's an American, and there's no allegation that he has bias against Americans in this case. There was no deposition testimony or other evidence to that effect. Somewhere in the brief it suggests he's even an Irish-American. Is that right? He is of Irish ancestry, correct, and so is Mr. Coughlin. He mandates a change on the vessel because of the very poor performance of the dynasty. It was the only vessel not to reach its quota for the year 2001. He tells the lower-down managers, the vice president, Andreasen, and Vargas, who's the vessel manager, I want both of those guys to not be captains anymore. I want some action done. I want a change here. This is not acceptable. Frank Vargas is the vessel manager who has the day-to-day contact with the vessel. He calls every day. He's the one. Are you saying that Hyde told Vargas that Mr. Coughlin would not be considered as a master for any ships? It's unclear that he said for any ships, but he said I don't want either of those guys to be. Later, Vargas considered Coughlin as a master for the Cadi-Anne, correct? What was clear to Vargas and Andreasen was that neither of these guys should be running that vessel. The dynasty. As captain, correct. That's what they understood. So the day-to-day contact, Frank Vargas, who is, again, an American citizen, born in America, and plaintiff admits in his deposition has no bias, doesn't believe he has a bias against Americans, makes a strong recommendation to Andreasen, who is the vice president of operations and has to make the ultimate call, that Coughlin, plaintiff, should be removed from the dynasty because of a number of reasons, and none of these reasons can really be. This is the legitimate business reasons for the decision. None of these can be assaulted. First of all, when he called the ship and talked to Mr. Coughlin, Mr. Coughlin didn't seem to know what was going on with the vessel. He had very little understanding of what status was. He said, I have to get back to you. He left a brake on when he was lowering a winch and ruined the brake, ruined the winch, had to be replaced. He lost a net, meaning it was lost at sea, not recovered, and that cost quite a bit of money. He asked for a television in the bridge where he was watching Mariners games, apparently. The chief engineer reported to Mr. Vargas, he has the TV up on the console while he's fishing, watching Mariner games, and that was a concern for Mr. Vargas as well. He talked to him and said, I'm going to throw this TV overboard if you keep doing that. Mr. Vargas formed the belief that Mr. Coughlin was not supporting the captain of the vessel because he wanted his job. He had asked why he didn't get the job as captain at the beginning of the season, and he was making complaints to other crew about Captain Peterson, and that was a concern for Mr. Vargas. Why is he undercutting his partner on this vessel? Fifth, I should say, Mr. Vargas took into account the past performance issues that Mr. Coughlin had while on other vessels, and these are, again, undisputed facts. On the Victoria Ann, when he was master, he failed to post prices, led to a lawsuit. It was mentioned in his performance evaluation at the time. It wasn't something we've made up after the fact. It was clear in the record at the time. When he was on the Katy Ann, he failed to manage a conflict between the crew and National Marine Fisheries Service personnel, leading to a $20,000 fine against the company. He admits in his deposition, plaintiff, that he could have handled that better, and he was talked to about that situation by company management, including the president. Finally, in making the decision about whether plaintiffs should be removed and let Peterson stay on board, which is one of the things that plaintiff complains about, well, why did Peterson get demoted from captain to mate? Why did I get blamed for what should have been Peterson's fault? Vargas took into account that Peterson had been sailing for 43 years, without any of the significant performance issues that had gone on and the undisputed performance issues that had gone on before in Mr. Coughlin's career. Now, in terms of Mr. Andreessen, it's important to note that there is strong evidence that he's not biased against the Americans. Before we go to Andreessen, a word about Vargas. As to the fourth assignment, when Coughlin had been removed from the dynasty, he was considered by Vargas for the position of master of the Katy Ann, a position that Coughlin had had in 1997, and he had not been moved downwards because of his performance on Katy Ann. And the reason given for not naming him master and only naming him mate on the Katy Ann was that he could not be reached by Vargas or he was avoiding Vargas. That was Vargas's version of the facts. Coughlin, in his deposition, testified that he was never contacted by Vargas while on the destiny before he was demoted in the sense of saying, you're being demoted from mate on the destiny. Do you want to go to captain on the Katy Ann? Vargas knew where Coughlin was, nor when he docked, nor shortly thereafter, nor when he was attending the master's mason pilots class at the Union Hall. He learned of his demotion by another fellow named Mr. Workman or word of him. Doesn't that set up a conflict in the evidence between whether there was a. Doesn't it go to some evidence of this pretextual on the part of Vargas to say that Coughlin was not named to the captain of the Katy Ann. For business reasons, I don't think I understand your question. I agree with you that there is an issue of fact in the record about who whether Coughlin received a message and whether he called him back. It's not a material issue of fact, however, because it doesn't show that Vargas had pretext based on national origin. Plaintiff admits that he does not believe that Vargas had a bias against him based on national origin. So that, I think, disposes of it. More importantly, it was a demotion in plaintiff's mind anyway. It was going whether he was going to be made master or mate of the Katy Ann. The Katy Ann has a very short fishing season, very limited money making potential. Where does Coughlin admit that Vargas had no pro Norwegian bias? Page 242 of his deposition lines four through twenty five. All right. And I can read you that portion. But it's basically do you believe that Frank Vargas is biased against you because you're American? And he says, no, I don't believe he has a bias against Americans. Good enough. All right. Let's go back. Talking about the loss of gear in one thing or another. There's a conflict as to whether or not that expense surrounding the maintenance of that vessel was extraordinary or not. There is. Yeah, there is a conflict about that. And that's why when I presented the undisputed facts, I said he left a brake on, ruined a winch and lost a net. Those are the undisputed facts. I don't think there's a dispute about the amount of damage. There is a dispute, as you raise, about whether it was disproportionate to the other vessels. Our perspective is, and Frank Vargas has submitted a declaration, that in relation to the total catch of all the vessels, it is disproportionate. You would expect that a vessel that's not catching as many fish and putting that kind of strain on the gear is not going to have the kind of losses that the dynasty had. So when you look at just the raw numbers, it doesn't look bad. But when you look at Vargas's explanation, it's pretty clear that it is disproportionate. And, again, it's not whether Vargas is right or wrong. It's whether there's any evidence that Vargas didn't honestly believe this assessment of the damage being disproportionate in view of his business judgment about how to assess that damage. All right. Now, moving on to Andreessen, the evidence that he's not biased against Americans is partly the same actor inference. And Judge Ralstein did not apply a mandatory presumption and say, aha, this is it, end of case. She did say use the word presumption, and the case law uses the word strong inference. But she basically said there's no evidence to rebut that. Well, now, there's a dispute between you and Mr. Collins with respect to the relevant period. He would narrow it to a much shorter time. You're referring back to events in 1997. Correct. What's the proper application of Bradley and the inference here? That's a good question. The same actor inference can be extended as far as three or four years. I have a case which I will fill out one of those forms and submit, but it's Schnabel 232F383, a Second Circuit case that held the same actor inference was just as applicable three years down the road. The person was hired when they were 60 and fired when they were 63 in an age case. And they said, well, they knew they were old at the time they hired them or older. And there's no inference of age discrimination from that based on the, even though three years had passed. In this case, and plaintiff's attorney doesn't cite any cases that say you can't apply it three or five years in advance after the fact. Even he cites a few cases that say three months, six months, but not exclusively. The relevant, I think the relevant question is always intent. What is in the mind of Mr. Andreasen? Is he discriminating against Norway? Is it more likely that he would be less discriminatory in 1997 than in 2001? And what would the basis of that be? Shouldn't plaintiff have to come up with some logical reason why Mr. Andreasen would be less prejudiced if he is prejudiced against Americans at this point in time? The only thing he can offer is that these captains weren't available. Well, many captains were available. Many Norwegian-born captains were available. In fact, we have evidence in the record that there were hundreds of people laid off in 1997 when Coughlin was retained by Andreasen. He was appointed to the Victoria Anne at a time when another captain of Norwegian descent was available, Tor Storkerson. And that is in the declaration of Inge Andreasen in support of motion for summary judgment. So we have at least one Norwegian captain who is available who he's selected over. He's then appointed to the dynasty to a very desirable position. Now, he disputes that. Mr. Collins disputes that. He disputes that because in Mr. Andreasen's deposition, he says, well, I wouldn't call it a promotion because technically he's going from a master on one vessel to a mate on the other. He never asked him the question, did you think it was a more favorable position? And I think Mr. Andreasen would have said yes, as plaintiff admits. In his deposition, he says, it was a lot more. In fact, I have the exact quote. It was a lot more attractive to me. On page 40 of the brief, they write, when ASC returned the dynasty to operation in 2000, thereby creating a more lucrative employment opportunity than that presented on the KDN. ASC transferred Mr. Coughlin to the desirable position of mate. I mean, it's very evident that it was a more desirable, more favorable position. Whether you want to call it a promotion or not, Andreasen got hung up on the semantics of whether to call it a promotion. He was never asked whether he thought it was a more or less favorable position. And I think the evidence from plaintiff's admissions is undisputed on that, that it was a more favorable position. Then I think a really critical piece of evidence is that when there's this opening on the dynasty, the first person the job is offered to as captain is an American. Andreasen and Vargas find Mike Kralovic, who's been a mate with American Seafoods for a long time. And they go to him and they say, we want to promote you. And for whatever reason, Kralovic declines the offer.  The intent of Andreasen clearly is not to run around replacing Americans with Norwegians. That's declined. And so he offers it to Ole Naughton, who is of Norwegian descent, who happens to be of Norwegian descent. But he has 20 years as a Norwegian captain with a license issued from Norway. Mr. Collins makes a big point about him just getting a license, a U.S. Coast Guard license in early 2002. Well, that's a little like saying I'm more qualified than Jerry Spence to argue this case because I have a Washington license. And he only has a license in Wyoming and California and New York. Well, it's the fishing that counts. And if you've been fishing in Norway and Russia for the same kind of fish as Ole Naughton was, he was the fishmaster on the world's most sophisticated factory trawler. And that's in the record in Andreasen's deposition. You're qualified to do this job. There's not an argument about Naughton's actual qualification. There's only a point made about his technically not getting a license until he got hired by American Seafoods. You know why? He didn't need a license before he got hired by American Seafoods. The other evidence of nondiscrimination is very strong as well. Mr. Andreasen appointed Barry Fitzpatrick as captain, another American, has retained Sandy Ritchie and Tim Thomas as American captains. Are these on other vessels? These are on other vessels, yes. And these three, those three Americans there, are the highest paid officers in American Seafoods' fleet, and those pay determined by Mr. Andreasen. And that's in his reply declaration in the record below. He's appointed Vince Krinsky as mate. That's in his deposition, page 100. He was an American when he filled the Ocean Rover with Jens Jansson. And he also apparently disfavors some Norwegians. Plaintiffs admitted in his deposition he had a conversation with Asbjorn Kvam, who was disgruntled because he was passed over for some job by Mr. Andreasen. And so there was a there's an admission there that it seems to be Mr. Andreasen's friends is what the disgruntles employees say, not because of national origin. And then as Judge Rothstein points out, Mr. Andreasen is an American citizen himself who has renounced his Norwegian citizenship, which is, again, also some evidence of non-discrimination against Americans. But he is within that class. He's certainly within that class. And, again, this goes to the issue of whether a rational trier of fact could find, given all of this, that national origin discrimination, more likely than not, was motivating Mr. Andreasen and Mr. Vargas and Mr. Hyde when they made the business judgment about the vessel. I would like to address the issues of less than a minute. Counsel. OK. I want to talk about the fact that plaintiff refers to two other Americans who were taken out at the same time as Mr. Coughlin, and that this makes some sort of pattern or statistical evidence of discrimination. I think it's very important to point out that the Ninth Circuit in Coleman v. Quaker Oaths has stated, statistics must show a stark pattern unexplainable on grounds other than the protected characteristic. We've cited the Aragon case, which is very applicable, that three employees is not a sufficient sample size. Even 11 employees is too small in the Shutt v. Sandoz case on page 33 of our brief. I'll end there with six seconds left. Thank you, Your Honor. Thank you, Counsel. Mr. Collins, you have reserved time. Thank you, Your Honor. It's not just about the fishing. Would you speak a little louder, Mr. Collins, please? It's not just about the fishing. It's about mastering very large vessels in U.S. waters, knowing the waters, knowing what the waters can do, and protecting the safety of the hundred crew members or so aboard these vessels. That is a significant fact. Coghlan had plied these waters, Alaska and off the coast of Washington and Oregon, for years. Ole Nottin had never plied these waters as a captain of a U.S. flag vessel or a captain of any other vessel. Counsel just gave you his closing argument at trial. He's asking you to weigh the evidence. He's asking you to draw inferences in favor of the moving party and against the non-moving party. That's not the test today. The test today is did Coghlan present specific and substantial evidence that Inge Andreasen preferred individuals of Norwegian national origin when he made the decisions affecting James Coghlan? The evidence we talked about earlier, the evidence that is presented in our briefs, provides that specific and substantial evidence and is more than ample to overcome summary judgment. This is a case where you can tell there are disputed facts. We're not saying that there are no disputed facts. We're not here asking for summary judgment. We're here asking for this case to be remanded. So all of these factual issues, so all of the credibility issues, for all of this very complicated case to be presented fully in front of a jury so that the jury can see the witnesses, the jury can weigh the evidence, the jury can draw the inferences, and the jury can make the factual findings that are necessary to decide this case. The district court put itself in the place of the jury in making all of those decisions. In disregarding Mr. Coghlan's evidence, in drawing inferences against him, and then applying the same actor inference as a mandatory presumption. Unless there are any questions, I would ask this Court to reverse this case and remand it for trial. Thank you. Thank you, counsel. No questions. The case just argued will be submitted for decision, and the Court will adjourn. Hear, ye, hear, ye. All persons having had business with the Honorable Judge of the United States Court of Appeals, please return to your seats. We will now depart. The district court for this session stands adjourned. Thank you.  I know. Yeah. Yeah. I'm good. I'm good. I'm a great man.
judges: O'scannlain, Leavy, Bea